# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Edward Poindexter,

      Plaintiff,

v.

Victoria Pohlmann, Officer; Lou Stander,
Associate Warden of Operations;
Krentz, Sgt.; C. Peine, Officer; Penelope
Malecha, "Penny" Career Case Mgr.;
James Lyons, "Jim" Assistant
Warden/Operations; Janice Hanlon,
"Jan" "RN"; Jaclyn Carter, "Jackie"
"CPD"; and Constantine Roehrich,
"Connie" Warden;

      Defendants.

Civ. No. 08-1186 (JNE/JJK)

**AMENDED REPORT AND
RECOMMENDATION**

Edward Poindexter, #27767, NSP, 1-A-12, P.O. Box 2500, Lincoln, NE 68542-2800, *pro se*.

Angela Behrens, Minnesota Attorney General's Office, 445 Minnesota St., Suite 900, St. Paul, MN, 55101, counsel for Defendants.

This matter is before the Court on Plaintiff's Motion for Partial Summary

Judgment (Doc. No. 59), and Defendants' Motion for Summary Judgment (Doc.

No. 74).[1] The case has been referred to this Court for a Report and

Recommendation under 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1. For the

---

[1] This Court also addresses Plaintiff's Motion for Submission of Supplementary Exhibits and Supplementary Affidavits (Doc. No. 63), and Plaintiff's Motion for Leave to Submit Supplementary Exhibits and Affidavits (Doc. No. 97). The Court has reviewed these materials and determined that these motions should be denied.

reasons discussed below, this Court recommends that Defendants' motion be granted, Plaintiff's motion be denied, and this action be dismissed without prejudice.

## BACKGROUND

Plaintiff is currently incarcerated in a Nebraska State Prison, serving a life sentence for first-degree murder. His Complaint relates to events that occurred while he was serving a portion of that sentence in the Minnesota Correctional Facility at Faribault ("MCF-FRB").[2] Plaintiff asserts four separate claims. First, he claims that Defendants opened and read his legal mail outside of his presence. Second, Plaintiff claims that Defendants confiscated his legal mail and did not give him notice that the documents were returned to the sender. Third, he claims that Defendants permitted tobacco smoking in his living unit at MCF-FRB, thus subjecting him to harmful levels of secondhand smoke. And Fourth, Plaintiff claims that Defendants conspired to transfer him out of the State of Minnesota to another facility in the State of Nebraska in retaliation for filing lawsuits against prison officials. Plaintiff filed suit in the United States District Court for the District of Minnesota under 43 U.S.C. § 1983, alleging that these

---

[2] Plaintiff began serving his sentence in a prison facility in Nebraska, but in 1979, he was transferred to the MNDOC pursuant to an Interstate Compact. (Exs. 1-34 at Ex. 18.) "The Interstate Corrections Compact allows Minnesota to exchange incarcerated offenders with other states when a correctional contract exists between Minnesota and the respective state." (Doc. No. 78, Aff. of Jerome Clay ("Clay Aff.") ¶ 2, Ex. 1.)

actions violated his rights under the First, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**A.     Claim One – Defendants Opened and Read Plaintiff's Legal Mail**

Plaintiff first alleges that certain Defendants opened his legal mail outside his presence in violation of his rights under the First and Fourteenth Amendments.  (Doc. No. 1, Compl. at 5, ¶ 1.)  The first incident allegedly occurred "[a]round 6:00 p.m. on Wednesday August 3, 2005," when Plaintiff went to the MCF-FRB mail officer's desk to pick up legal mail "from the clerk of the U.S. District Court in St. Paul."  (Doc. No. 5, Exs. 1-34 at Ex. 2.)  Plaintiff asserts that Defendant Victoria Pohlmann opened the package in front of him and then he took it to from the mailroom to read.  (*Id.*)  After reading the mail, Plaintiff discovered that the package had already been opened before Pohlmann opened it in front of him; it appeared to have been cut open and then stapled back together with two staples.  (*Id.*)  Plaintiff does not know when the stapling occurred.  (*Id.*)

Plaintiff next alleges that events similar to the August 3, 2005 incident occurred on January 5, 2006.  (Compl. at 5, ¶ 3.)  On that date, Plaintiff again went to the mailroom to pick up a package containing a judge's order.  (Exs. 1-34 at Ex. 3.)  Plaintiff noticed that the envelope had already been opened and mentioned this to Pohlmann.  Plaintiff asserts that Pohlmann explained that "it was probably an 'accident[.]'"  (*Id.*)  Pohlmann then removed the contents of the envelope which included a form from someone named "C. Davis" in the Mail

Department, which stated "Legal mail opened in Error – I apologize." (*Id.* at Ex. 6.) Plaintiff also asserts that it appeared Pohlmann "found the 'incident' very amusing." (*Id.* at Ex. 3.)

Similar forms reflect that MCF-FRB officers again opened Plaintiff's legal mail in error, presumably outside his presence, on May 2, 2005 (*Id.* at Ex. 7), and August 29, 2005. (*Id.* at Ex. 8.) C. Davis appears to have been involved in the August 29, 2005 incident as well. (Exs. 1-34 at Exs. 5, 8.) In each instance, an official acknowledged the fact that the mail was opened and noted that the mail had been opened in error. (*Id.*)

On January 24, 2006, Plaintiff sent a memorandum to Peter J. Orput, Director of Policy and Legal Services for the Minnesota Department of Corrections ("MNDOC"), and Defendants Roehrich and C. Davis complaining about some of the incidents in which his legal mail had been opened outside his presence. (*Id.* at Ex. 9.) There is no other evidence that Plaintiff attempted to resolve this problem at the administrative level using MCF-FRB's procedures.

**B.     Claim Two – Defendants Confiscated Plaintiff's Legal Documents and Refused to Return Them**

Plaintiff next alleges that on or about February 14, 2005, prison officials confiscated two police reports sent to him through the mail that he intended to use in preparation for a post-conviction appeal in the State of Nebraska and that this confiscation violated his First, Eighth, and Fourteenth Amendment rights. (Compl. at 6, ¶ 7.) Prison officials confiscated these documents because they

"contain[ed] contraband."  (Exs. 1-34 at Ex. 10.)  Specifically, the officials denied

the documents on the ground that they were "documents on [an]other individual."

(*Id.*)

In response to the confiscation of these documents, Plaintiff filled out a

complaint form, known as a "Kite," in which he explained that the documents

confiscated were "from [his] own criminal case records needed for [his] criminal

appeal."  (*Id.* at Ex. 11, at 2.)  Plaintiff requested that prison officials return the

documents.  (*Id.*)  On March 10, 2005, Defendant Lou Stender indicated that

Plaintiff's complaint via the Kite had been "received and noted."  (*Id.* at 1.)  On

March 16, 2005, Plaintiff received another response from prison officials

explaining that the documents he wanted were "being denied at the supervisory

level" and that he could inform the mailroom of what he wanted done with the

documents (*Id.* at Ex. 12); he had the options of returning the documents to the

sender or having them destroyed.  (*See id.* at Ex. 10.)  Plaintiff asserts that he

sent a stamped, addressed envelope to the mailroom to have the police reports

sent back out, but received no confirmation from the mailroom that the

documents had been sent.  (Compl. at 6, ¶ 11.)  There is no evidence that

Plaintiff attempted to further pursue resolution of this issue at the administrative

level.

## C.    Claim Three – Defendants Permitted Smoking in Plaintiff's Living Unit

Plaintiff's third claim alleges that Defendants Sergeant Krentz, Pohlman,

and C. Peine, along with other prison officials smoked tobacco, and permitted

tobacco smoking, in his living unit at MCF-FRB in violation of his Eighth and Fourteenth Amendment rights. (Compl. at 7, ¶ 12.) Plaintiff kept track of the incidents from January 18, 2006, through May 12, 2006, and asserts that smoking occurred in his living unit in 26 separate affidavits. (Exs. 1-34 at Ex. 15.) For example, on January 18, 2006, Plaintiff explains that he smelled cigarette smoke in his room, went down the hall to pick up medicine, and noticed smoke in the air around the officer's desk. (*Id.* at 3.) He asserts that the officer's desk was crowded with officers taking "their usual chit-chat and smoke break in our unit." (*Id.*) Plaintiff further alleges that Pohlmann and Krentz were both present at the desk. (*Id.*)

According to Plaintiff, after he complained to Krentz on January 25, 2006, about ongoing smoking in Plaintiff's living unit, Krentz responded with no more than a "blank stare" and the smoking incidents increased thereafter. (*Id.* at 5.) Plaintiff also asserts that he complained to a nurse at MCF-FRB that his cough was aggravated by all of the smoking, and when she informed him that there was no smoking going on in the unit, he detected an odor of cigarette smoke coming from her work area. (*Id.* at 7.) There is no evidence that Plaintiff attempted to further pursue resolution of this issue at the administrative level.

**D.     Claim Four – Defendants Conspired to Kick Plaintiff Out of the State Before His Habeas Corpus Hearing**

Plaintiff's fourth claim alleges that Defendants retaliated against him because he filed numerous lawsuits against MNDOC employees and officials.

Plaintiff asserts that Defendants accomplished this retaliation by ensuring that he would be transferred out of the State of Minnesota and back to Nebraska before he was able to attend a hearing on a petition for a writ of habeas corpus. (Compl. at 8-11, ¶¶ 24-41.)

On May 23, 2006, a Program Review Team ("PRT") met to review issues related to Plaintiff's continued incarceration at MCF-FRB. (Exs. 1-34 at Ex. 18.) The PRT noted, in its Action Report (the "Report"), that Plaintiff "is now posing increased concern from a variety of viewpoints." (*Id.*) Among the concerns Plaintiff presented to the PRT were his difficulty getting along with other offenders in the same unit, his inability to reside in the general population in any MNDOC facility, his medical needs demanded increased attention that was expected to increase over time, and his willingness or ability to participate in recommended healthcare. (*Id.*; *see also* Doc. No. 83, Aff. of Nanette Larson ("Larson Aff.") ¶¶ 2-5.) The PRT also noted that "[t]here is some evidence of [Plaintiff] initiating legal action against MN DOC in regards to his sentence and overall time he has served in prison, but that in itself would not be impetus to transfer him." (Exs. 1-34 at Ex. 18.) The PRT unanimously agreed that Plaintiff's incarceration at MCF-FRB should cease, and recommended that Plaintiff be returned to the State of Nebraska. (*Id.*)

While Plaintiff was incarcerated at MCF-FRB, he had a pending habeas-corpus hearing that was scheduled for a telephone conference on July 11, 2006. (*Id.* at Ex. 16.) On June 5, 2006, however, during a meeting with his "case

manager," Defendant Penelope Malecha, Plaintiff learned that he was going to be transferred back to Nebraska "for no stated reason." (Compl. at 8, ¶ 24.) That same day, Defendant Jim Lyons issued an MNDOC Administrative Segregation Order for Plaintiff because he would be held for another authority pending transfer, and Plaintiff remained in administrative segregation until his eventual transfer. (Exs. 1-34 at Ex. 17.)

Plaintiff sent a Kite to Lyons on June 5, 2006, informing Lyons that he had a court hearing scheduled around July 19, 2006, "in Rice County Court via teleconference." (*Id.* at Ex. 19.) Plaintiff also requested that a hold be placed on his transfer back to Nebraska until the case in Rice County Court was resolved. (*Id.*) Lyons responded on June 9, 2009, informing Plaintiff that prison officials at MCF-FRB were not aware of a transfer date, but that such transfers "often take quite awhile," and that Plaintiff's placement in administrative segregation was "standard procedure." (*Id.*) There is no evidence that Plaintiff attempted to further pursue resolution of this issue at the administrative level.

Prison officials from Nebraska transferred Plaintiff out of MCF-FRB and back to the State of Nebraska on June 22, 2006. (Compl. at 9, ¶ 30; *see* Doc. No. 67, Aff. and Decl. of Undisputed Facts in Supp. of Pl.'s Mot. for Partial Summ. J. ("Pl.'s May 18, 2009 Aff.") ¶ 4; Doc. No. 78, Aff. of Jerome Clay ("Clay Aff.") ¶ 5.) On June 26, 2006, Rice County received a call from MCF-FRB informing the Rice County clerk that Plaintiff had been transferred. (Exs. 1-34 at Ex. 19b, at 3.) The record reflects that on July 13, 2006, two days after the

telephone conference in Rice County was to take place, Plaintiff's case there settled. (*Id.* at 2-3.)

## DISCUSSION

### I.    Standard of Review

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the party opposing the motion must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Id.* at 255.

### II.   Analysis

Defendants have moved for summary judgment on a number of grounds.

For the reasons that follow, this Court concludes that Defendants are entitled to summary judgment because Plaintiff has failed to exhaust the available administrative remedies for all of his claims. This Court therefore recommends that this action be dismissed.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement serves at least four important objectives: (1) it ensures a more complete development of the factual record before the matter is brought to federal court; (2) it gives the reviewing court the benefit of any special knowledge and experience the administrative agency may have; (3) it acknowledges administrative agency's autonomy; and (4) it promotes judicial economy by resolving those claims that can be resolved at the administrative level. *See Mason v. Ciccone*, 531 F.2d 867, 870 (8th Cir. 1976). "Exhaustion under the PLRA requires 'proper exhaustion,' which 'demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some structure on the course of its proceedings.'" *Wolf v. Johnson*, Civil No. 08-818 (PJS/JSM), 2009 WL 585971, at *6 (D. Minn. Mar. 6, 2009) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006)). This means that an inmate must use "all steps that the agency holds out, and do[] so properly (so

that the agency addresses the issues on the merits)." *Woodford*, 548 U.S. at 90-91.

"Administrative exhaustion is an affirmative defense that defendants have the burden to plead and prove." *Nixon v. Sanders*, 243 Fed. App'x 197, 199 (8th Cir. 2007). With respect to all Plaintiff's claims, Defendants appropriately plead exhaustion as an affirmative defense. (Doc. No. 20, Ans. ¶ 71.) Defendants have also offered the following evidence showing that administrative procedures were available for Plaintiff to attempt to resolve the matters underlying the claims he presents in this suit.

MCF-FRB has a procedure for its inmates to follow in order to raise issues related to their confinement; this procedure was in place at the time when the events giving rise to Plaintiff's claims occurred. (Doc. No. 80, Aff. of Kim Ebeling ("Ebeling Aff.") ¶ 2, Ex. 1.) This "Grievance Procedure" provides that prisoners who have a complaint must first file a "Kite" form with staff to informally resolve the complaint. (*Id.*) If the prisoner is not satisfied with the result of filing the Kite, he can pursue the matter further by filing a formal grievance with the facility's grievance coordinator. (*Id.*) The facility's grievance coordinator will then process the grievance and notify the prisoner of the warden's or superintendent's decision on the grievance. (*Id.*) If the prisoner is not satisfied with the outcome after filing the formal grievance and its resolution, the prisoner can then appeal to the central office's grievance-appeal coordinator within fifteen days of the response to the formal grievance. (*Id.*) Once a grievance appeal has been resolved

pursuant to this procedure, no further appeals are permitted. (*Id.*) Although for some of Plaintiff's claims he resorted to the informal Kite procedures, he never filed a formal grievance while he was incarcerated at MCF-FRB. (*Id.* ¶ 5.)

MCF-FRB has a separate procedure for an inmate to follow in order to complain about the prison's decision to withhold mail items from the inmate, which was also in place at the time Plaintiff's mail containing the police reports was confiscated. (Doc. No. 86, Aff. of Melissa Paquette ("Paquette Aff.") ¶ 3, Ex. 1.) When incoming mail is not delivered to an inmate because it is determined that the mail is "unallowable,"[3] prison officials will send the inmate a completed Notice of Non-Delivery of Mail/Package explaining why the items were rejected. (*Id.* ¶ 3, Ex. 1 at § H, at ¶ 1.) Except in certain circumstances not relevant to this case, an inmate has 30 days to either inform prison officials that the mail may be destroyed or returned to the sender. (*Id.* ¶ 3, Ex. 1 at § H, at ¶ 3(a).) Inmates "may request a review of decisions regarding unallowable mail by sending a kite to the mailroom supervisor within 15 days of receipt of the Notice of Non-Delivery of Mail/Package." (*Id.* ¶ 3, Ex. 1 at § I, at ¶ 2.) The mailroom supervisor will provide the inmate with a written response indicating the decision that is made and the "rationale will be sent to the offender within five days of the receipt of the offender's request, excluding weekends and holidays."

---

[3]      As relevant here, mail is "unallowable" when it "contains information detailing the circumstances of another offender's crime, e.g., offender face sheets, legal documents, police reports, and Internet material. An offender is allowed to receive such material about him/herself only[.]" (Paquette Aff. ¶ 3, Ex. 1 at § F, at ¶ 19.)

(*Id.*)  "Offenders may request a subsequent review by the correspondence review authority within 15 days of receiving the mailroom supervisor's decision."  (*Id.* ¶ 3, Ex. 1 at § I, at ¶ 3.)  Within five days of receiving such an appeal, excluding weekends and holidays, the correspondence review authority will provide a written decision and explanation, and that decision is the final administrative decision available to an inmate for such complaints.  (*Id.*)  The only evidence in the record concerning Plaintiff's utilization of these procedures indicates that he attempted to resolve the matter through the informal Kite process, eventually sending a Kite to the mailroom supervisor, but that he never attempted to obtain an appeal from the correspondence review authority.  (*See* Paquette Aff. ¶ 7; *see also* Defs.' Mem. 9-10.)

The Court now addresses whether Plaintiff has rebutted this showing that Plaintiff failed to exhaust the administrative remedies available to him regarding his claims.

### A.    Opened Legal Mail

The only evidence showing that Plaintiff complained internally about the opening of his legal mail is the memorandum that Plaintiff sent to Peter J. Orput, Director of Policy and Legal Services for the MNDOC, and Defendants Roehrich and C. Davis complaining about two of the incidents.  There is no other evidence showing that Plaintiff attempted to resolve this problem at the administrative level using MCF-FRB's procedures.  For instance, there is no evidence that Plaintiff attempted to first resolve the issue informally through the use of Kite forms.  Nor

is there evidence that Plaintiff thereafter filed a formal grievance after dissatisfaction with the outcome from the Kite process. There is also no evidence that Plaintiff pursued an appeal to the central office's grievance coordinator. On the other hand, through affidavit testimony, Defendants have offered evidence that Plaintiff did not exhaust the available administrative remedies for this claim. (*See* Ebeling Aff. ¶ 5.)

Therefore, Defendants are entitled to summary judgment with respect to this claim because there is no genuine issue with respect to whether Plaintiff exhausted his available administrative remedies for his complaints regarding the opening of his legal mail outside his presence. The only evidence in the record indicates that Defendants appropriately plead failure to exhaust as an affirmative defense, that administrative remedies were available to Plaintiff to address the issue while at MCF-FRB, and that Plaintiff did not utilize the procedures available. *See Wolf*, 2009 WL 585971, at *6 (noting that a prisoner is required to grieve issues using the procedures that are put in place by the prison). Because Plaintiff failed to exhaust his administrative remedies, Defendants should be entitled to judgment as a matter of law with respect to this claim.

### B.    Withheld Mail

With respect to Plaintiff's claim regarding the withholding of two police reports mailed to him at MCF-FRB, there is evidence that Plaintiff followed the initial administrative procedures in place for inmate complaints of this kind. Plaintiff filled out a Kite attempting to resolve the issue, he asked that the

documents be returned to the sender and provided a stamped envelope, Defendant Lou Stender responded to the Kite noting that it had been received, and Plaintiff received another response from Lori Nelson, the mailroom supervisor, that the documents were being denied at the supervisory level and that he could inform the mailroom of what he wanted done with the documents. There is no evidence, however, that Plaintiff attempted to further pursue resolution of this issue to Jacie Carter, the correspondence review authority for MCF-FRB. (Paquette Aff. ¶ 7.)

Plaintiff argues that he "did not have to grieve [the] loss of his police reports because it was a single incident, and to grieve it all the way up the chain of command would have taken longer than the time he had to thoroughly exhaust [the] matter." (Doc. No. 106, Pl.'s Resp. to Defs.' Mem. of Law Opposing Pl.'s Mot. for Partial Summ. J. ("Pl.'s Reply") 2.) However, neither the PLRA nor the prison's grievance procedure for disputes regarding withheld mail provides for such a single-incident exception to the exhaustion requirement.

Because there is no dispute that Defendants appropriately plead failure to exhaust as an affirmative defense, that administrative procedures were available to remedy the denial of the mail, and that Plaintiff failed to follow those established procedures, he failed to exhaust his administrative remedies and Defendants should be entitled to judgment as a matter of law on this claim.

## C. Smoking

Plaintiff provided evidence that he complained internally regarding his

claim that excessive smoking was permitted in his living unit at MCF-FRB. He complained to Defendant Krentz on January 25, 2006, about ongoing smoking in his living unit, and according to Plaintiff, Krentz did nothing and the smoking increased. Further, there is evidence that Plaintiff complained to a nurse at MCF-FRB that his cough was aggravated by all of the smoking going on in his living unit. However, there is no evidence that Plaintiff attempted to further pursue resolution of this issue at the administrative level. There is no evidence that Plaintiff filled out a Kite, filed a formal grievance, or appealed the formal decision to the central office. Defendants, on the other hand, have offered affidavit testimony supporting that Plaintiff did not exhaust the available administrative remedies for this claim. (*See* Ebeling Aff. ¶ 5.)

Because there is no dispute that Defendants appropriately plead failure to exhaust as an affirmative defense, that administrative procedures were available to remedy the smoking incidents, and that Plaintiff failed to follow those established procedures, he has failed to exhaust his administrative remedies and Defendants should entitled to judgment as a matter of law on this claim.

### D.    Retaliatory-Transfer

There is evidence that Plaintiff used some administrative procedures available to him to dispute the decision that he be transferred from MCF-FRB back to Nebraska. Plaintiff sent a Kite to Defendant Lyons on June 5, 2006, requesting that the transfer not take place because of his pending telephone conference in a habeas case. Lyons responded to the Kite within five days,

explaining that no transfer date had been set and that the transfer to administrative segregation pending transfer was MCF-FRB policy. However, there is no evidence that Plaintiff attempted to further pursue resolution of this issue at the administrative level. But again, Defendants have offered evidence that Plaintiff did not exhaust the available administrative remedies for this claim. (*See* Ebeling Aff. ¶ 5.)

Plaintiff argues that the PLRA does not apply to his transfer claim because such a claim does not "challeng[e] prison conditions." (Doc. No. 96, Pl.'s Resp. to Mem. of Law Supp. Mot. for Summ. J. of Defs. ("Pl.'s Resp.") 5-6.) Plaintiff offers no support for this position. The PLRA applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Plaintiff's retaliatory-transfer claim relates to the location of his confinement, which under any sensible construction, is a suit "about prison life." *See id.* Thus, this Court concludes that the exhaustion requirement in 42 U.S.C. § 1997e(a) applies to Plaintiff's retaliatory-transfer claim.

Planitiff next argues that even if he were required to exhaust administrative remedies, none were available to him because "everyone within the MNDOC with the authority to help him was either a co-conspirator . . . or stood idly by while [his transfer] happened. (Pl.'s Resp. 6.) "[I]nmates cannot be held to the exhaustion requirement of the PLRA when prison officials have prevented them from exhausting their administrative remedies." *Lyon v. Vande Krol*, 305 F.3d

806, 808 (8th Cir. 2002). "Although the PLRA does not provide a definition, the plain meaning of the term 'available' is 'capable of use for the accomplishment of a purpose: immediately utilizable . . . accessible[.]'" *Miller v. Norris*, 24 F.3d 736, 740 (8th Cir. 2001) (quoting *Webster's Third New International Dictionary* 150 (1986)). Although the basis for Plaintiff's conspiracy argument is not entirely clear, it appears that Plaintiff is arguing that proof of the conspiracy can be found in the PRT Action Report (Exs. 1-34 at Ex. 18), which set forth the reasons for his transfer. (*See* Pl.'s Resp. 6.) Plaintiff may be asserting that the Report is evidence of the conspiracy because it mentions that "[t]here is some evidence of [Plaintiff] initiating legal action against MN DOC in regards to his sentence and overall time he has served in prison, but that in itself would not be impetus to transfer him." (Exs. 1-34 at Ex. 18.) Specifically, Plaintiff asserts that "[t]his statement sounds defensive to plaintiff." (Pl.'s Resp. 23.) Even if the Court infers that this statement in the Report shows some motivation on the part of the PRT to transfer Plaintiff out of MCF-FRB because he initiated legal action, this statement does not support the conclusion that the individuals who would have been responsible for reviewing any grievances regarding the matter were conspiring against Plaintiff. The MCF-FRB grievance procedure requires a formal grievance to be filed with the facility's grievance coordinator. Plaintiff filed no such grievance nor offered any evidence to show that the grievance coordinator was part of the alleged conspiracy to retaliate against him. Nor did Plaintiff file any appeal to the MNDOC's central office or offer any evidence that

any official in that office was engaged in a retaliatory conspiracy against him. Thus, Plaintiff has offered no evidence to support his claim that the officials who would have been involved in the administrative process were part of a conspiracy. All Plaintiff has offered is conjecture insufficient to permit a conclusion that the administrative process was rendered incapable of use for the accomplishment of a purpose. *See Miller*, 24 F.3d at 740 (defining he term "available" as used in the PLRA).

Plaintiff also argues that MCF-FRB's administrative remedies were unavailable to him because his transfer happened so quickly that he did not have sufficient time to pursue any administrative remedy. (*See* Pl.'s Resp. 8.) As noted above, an administrative remedy is "'available' [if it] is 'capable of use for the accomplishment of a purpose: immediately utilizable . . . accessible[.]'" *Id.* (quoting *Webster's Third New International Dictionary* 150 (1986)). The undisputed evidence establishes that Plaintiff first learned of the transfer decision on June 5, 2006. That same day, Plaintiff sent a Kite to Defendant Lyons, who responded four days later. There is no evidence that Plaintiff thereafter attempted to file a formal grievance with the MCF-FRB grievance coordinator, but was prevented from doing so by his transfer, which occurred on June 22, 2006— 17 days after he learned of the decision. Plaintiff has presented no evidence to rebut Defendants' showing that there were procedures in place for Plaintiff to pursue this complaint. His conclusory assertion that he did not have enough time to pursue such remedies does not overcome the evidence in the record that the

remedies were available to him.

Thus, this Court concludes that Plaintiff has failed to exhaust his administrative remedies on any of his claims and that Defendants should be entitled to summary judgment on those claims.  As a result, this Court recommends that this action be dismissed without prejudice.  *See Jones v. Bock*, 549 U.S. 199, 211 (2007) (noting that dismissal is mandatory if a plaintiff has failed to exhaust his administrative remedies); *see also Johnson v. Jones*, 340 F.3d 624, 627-28 (8th Cir. 2003) (same).  This Court further concludes that because summary judgment in favor of Defendants is appropriate on all claims on the ground that Plaintiff has failed to exhaust his administrative remedies, Plaintiff's motion for partial summary judgment should be denied.

## RECOMMENDATION

Based upon the foregoing and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Partial Summary Judgment (Doc. No. 59), be **DENIED**;

2.    Defendants' Motion for Summary Judgment (Doc. No. 74), be **GRANTED**;

3.    Plaintiff's Motion for Submission of Supplementary Exhibits and Supplementary Affidavits (Doc. No. 63), be **DENIED**;

4.    Plaintiff's Motion for Leave to Submit Supplementary Exhibits and Affidavits (Doc. No. 97), be **DENIED**; and

      5.     This action be **DISMISSED WITHOUT PREJUDICE**.

Dated:  October 19, 2009

                      *s/ Jeffrey J. Keyes*_____
                      JEFFREY J. KEYES
                      United States Magistrate Judge


Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **November 2, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.